**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

<table>
<tr><td>

**COMMODITY FUTURES TRADING COMMISSION,**

         **Plaintiff,**

      **v.**

**MICHELE SPAGNUOLO,**

        **Defendant.**

</td><td>

Civil Action No. 26-cv-4419

**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF, AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS**

**JURY TRIAL DEMANDED**

</td></tr>
</table>

Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through its attorneys, alleges as follows:

## I.    INTRODUCTION

1.    From at least October 2025 through at least December 2025 (the "Relevant Period"), Defendant Michele Spagnuolo ("Spagnuolo") engaged in a fraudulent and deceptive scheme in connection with the purchase and sale of event contracts traded on the prediction market known as Polymarket.com.

2.    During the Relevant Period, Spagnuolo was an employee of a subsidiary of Alphabet, Inc. ("Alphabet"), a publicly traded technology company listed on the Nasdaq stock exchange.  Alphabet owns and operates Google, LLC and other subsidiaries ("Google").  In that role, Spagnuolo acquired sensitive nonpublic information regarding the data in Google's official Year in Search list for 2025, as published on Google's Year in Search hub (trends.withgoogle.com/year-in-search/) (the "2025 Year in Search List").  Spagnuolo had a duty and obligation to maintain the confidentiality of the information he acquired, a duty he breached by misappropriating the information and using it to trade contracts related to the 2025 Year in

1

Search List on Polymarket.com. Spagnuolo obtained approximately 1.2 million dollars in illicit profits through his scheme.

3. By this conduct and further conduct described herein, Spagnuolo violated Section 6(c)(1) of the Commodity Exchange Act (the "Act"), 7 U.S.C. § 9(1), and Commission Regulation ("Regulation") 180.1(a)(1), (3), 17 C.F.R. § 180.1(a)(1), (3) (2025).

4. Unless restrained and enjoined by this Court, Spagnuolo will likely continue to engage in acts and practices alleged in this Complaint and similar acts and practices, as described below.

5. The CFTC brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, to enjoin Spagnuolo's unlawful acts and practices and to compel his compliance with the Act and the Regulations promulgated thereunder. The CFTC also seeks civil monetary penalties, disgorgement of profits obtained through the scheme at issue, restitution, trading and registration prohibitions, and any other such equitable and ancillary relief as the Court deems necessary or appropriate.

## II. JURISDICTION AND VENUE

6. The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), authorizes the CFTC to seek injunctive and other relief against any person whenever it shall appear to the CFTC that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act, or any rule, regulation, or order thereunder, and provides that U.S. district courts "shall have jurisdiction to entertain such actions."

2

7.      Venue lies properly with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because certain transactions, acts, practices, and courses of business alleged in this Complaint occurred, are occurring, or are about to occur in this District.

### III.    THE PARTIES

8.      Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act and the Regulations promulgated thereunder.

9.      Defendant **Michele Spagnuolo** is an individual who resides in Switzerland.  During the relevant period Spagnuolo was a software engineer at Google.  Spagnuolo has never been registered with the CFTC in any capacity.

### IV.    RELEVANT NON-PARTIES

10.     **Polymarket** is a financial services company that, among other things, facilitates the trading of event contracts through a decentralized-finance ("DeFi") trading protocol operating on the Polygon blockchain ("Polymarket.com").  Polymarket.com lists event contracts for trading on the DeFi protocol on its website, www.polymarket.com.

11.     The Polygon blockchain is maintained by Polygon Labs.  Users access the Polygon blockchain through nodes that contain a copy of the blockchain.  Computer nodes that validate and record transactions on the Polygon blockchain are located in the United States.

12.     Polymarket.com is operated by Blockratize, Inc., a Delaware corporation that does business under the name Polymarket, and Adventure One QSS Inc., a Panamanian corporation. Polymarket's corporate headquarters is in New York, New York.

13.     Polymarket's "Markets Team" manages the creation and deployment of contracts that are listed on Polymarket.com.  During the Relevant Period, a majority of the Markets Team

worked in its New York headquarters.  This included Polymarket's Head of Markets and one of its two Markets Leads.

14.    For a subset of contracts based on routine or predictable events (such as regularly scheduled sports games or contracts related to the price of Bitcoin during a specified time period), Polymarket.com uses software to automatically deploy the contracts.  For all other contracts, the Markets Team determines which contracts to list for trading on Polymarket.com, creates and deploys those contracts through a portal developed in New York, New York and drafts the rules for contracts.  The Markets Team also manages the operation of Polymarket.com's liquidity rewards program.

15.    Some employees on Polymarket.com's "Platform Team" are also based in New York, New York.  The Platform Team is responsible for supporting the infrastructure traders use to execute peer-to-peer transactions on Polymarket.com.

16.    **Alphabet, Inc.** is a public holding company of technology companies, with subsidiaries including Google.  Google operates Google Search, an online search engine.  Both Alphabet and Google's corporate headquarters are in Mountain View, California.

## V.    STATUTORY BACKGROUND AND LEGAL FRAMEWORK

### A.    The Commodity Exchange Act

17.    The purpose of the Act is to "serve the public interests . . . through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission," as well as "to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to [the] Act and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and

market participants." Section 3 of the Act, 7 U.S.C. § 5. The Act confers on the CFTC "exclusive jurisdiction" to regulate various categories of derivatives markets, including swaps. 7 U.S.C. § 2(a)(1)(A).

**B.      Section 6(c)(1) of the Commodity Exchange Act and CFTC Regulation 180.1(a)**

18.      Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), in relevant part, makes it unlawful for any person, directly or indirectly, to:

> use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate . . .

19.      CFTC Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2025), promulgated pursuant to the authority in Section 6(c)(1) of the Act (which was enacted under the Dodd-Frank Act), makes it unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; . . . or
>
> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

## VI.      FACTS

**A.      Prediction Markets**

20.      On prediction markets, participants buy and sell event contracts, which are derivative instruments that enable parties to trade on their predictions about whether or to what extent a future event—which may relate to economics, elections, climate, sports, or anything else

of potential financial, economic, or commercial consequence—will occur.  Event contracts often have a binary payoff, where the winning side of the contract receives a fixed amount, and the losing side of the contract receives nothing.

21.    Polymarket.com uses the UMA Oracle to determine the resolution of the event contracts it lists for trading on its DeFi protocol, which operates as a prediction market.  UMA is a so-called decentralized oracle.  Anyone can propose a resolution of a Polymarket.com event contract by selecting a winning outcome, posting a bond, and submitting that proposal to the UMA Oracle.  After a proposal is made, there is generally a two-hour challenge period where anyone can dispute the proposed outcome by posting a counter-bond.  If there is a dispute, there is a 24 to 48-hour debate period, during which evidence can be submitted in UMA's Discord channels.  After the debate period—or if there is no debate period, after two hours—UMA token holders vote on the correct outcome.  If one of the proposed resolutions is accepted, trading on the event contract stops, and holders of winning positions are entitled to redeem their shares for 1 USDC.e per share.  USDC is a stablecoin, the value of which is pegged 1:1 to the U.S. dollar.  USDC.e is a version of USDC that has been "bridged" from Ethereum to another blockchain ecosystem such as Polygon.

22.    For example, if Polymarket.com creates a contract based on whether the Federal Reserve's Federal Open Market Committee ("FOMC") will lower interest rates at one of its regularly scheduled meetings, a person holding a "Yes" share in that contract receives 1 USDC.e for each share they hold if the FOMC lowers interest rates, while a person holding a "No" share receives 1 USDC.e for each share they hold if the FOMC does not.  A person holding shares in the losing side of the contract receives nothing.

23.    While Polymarket.com may list multiple dates or criteria for occurrences related to the same event, each of those dates or criteria is listed as a separate event contract.  Using the

previous example, if Polymarket.com creates contracts based on whether the FOMC will keep interest rates the same, lower interest rates by 25 basis points, or lower them by 50 basis points or more, it will create three separate Yes/No contracts for each threshold.  As another example, if Polymarket.com creates contracts based on whether a specified event will occur by December 31, January 31, or February 28, it will create three separate Yes/No contracts, one for each of those dates.

24.    Polymarket.com lists the price of a contract as a percentage, with the price of the contract equal to one cent for each percentage point.  For example, if Polymarket.com shows the price of a "Yes" share of a contract as 25%, that means buying one "Yes" share costs $0.25.

25.    The trading of event contracts, which is influenced by, among other things, real-time information, determines the value of an event contract.  Between the time an event contract is listed and the time the contract is resolved, its price can fluctuate based on traders' perception of whether the event will occur or not.  Information indicating that an event is likely or certain to occur is information that affects or tends to affect the price of an event contract.

26.    Event contracts are a type of "swap" as defined by the Act.  Section 1a(47)(A) of the Act broadly defines "swap" to include "any agreement, contract, or transaction"—

> (i) that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind;

> (ii) that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence; . . .

> (iv) that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap . . . [or,]

> (vi) that is any combination or permutation of, or option on, any agreement, contract, or transaction described in any of [these clauses].

27.    Event contracts are swaps because they are settled based on the occurrence or non-occurrence of a specified future event with potential financial, economic, or commercial consequences, such as the occurrence of a weather event, the outcome of an election, the price of a market index, or prevailing interest rates.

**B.    2025 Year in Search List**

28.    On or around October 14, 2025, Polymarket.com began listing event contracts in the category "#1 Searched Person on Google this year" that resolved based on the rankings in Google's official Year in Search list for 2025, as published on Google's Year in Search hub (trends.withgoogle.com/year-in-search/) on its DeFi protocol.  On various dates between October 15, 2025 and November 20, 2025, Polymarket.com listed additional event contracts that resolved based upon Google's official Year in Search list for 2025, including multiple contracts under the categories of "#2 Searched Person on Google this year," "Top 5 Most Searched People on Google 2025," "Top 5 Most Searched Actors on Google 2025," "#1 Searched Passings on Google this year?" and "#1 Searched TV Show on Google this year?" (collectively, the "2025 Year in Search List Contracts").

29.    The 2025 Year in Search List Contracts are swaps because they are agreements, contracts, or transactions providing for a purchase, sale, payment, or delivery dependent on the occurrence or nonoccurrence of an event or contingency, *i.e.*, the rankings reflected in the 2025 Year in Search List, associated with a potential financial, economic, or commercial consequence. Google generates most of its revenue by leveraging its search platform to sell advertising products. This search data is commercially valuable proprietary information to Google.  Google invests substantial resources each year on producing a "Year in Search" marketing campaign to reveal top annual search trends with maximum impact.  The highly anticipated release generates media

coverage that drives additional traffic to Google, and demonstrates the scale and significance of Google's search platform to advertisers.

30.    The 2025 Year in Search List Contracts were traded in interstate commerce.

**C.    The Release of 2025 Year in Search List**

31.    The 2025 Year in Search List was ultimately released by Google on December 4, 2025.  Google published the 2025 Year in Search List on Google's Year in Search hub.  Prior to December 4, 2025, the rankings reflected in the 2025 Year in Search List were unavailable to the general public and had not been disseminated by Google in a manner that made it generally available to the trading public.

**D.    Defendant's Knowledge of the 2025 Year in Search List**

32.    During the Relevant Period, Spagnuolo had access to confidential non-public information concerning the 2025 Year in Search List though his employment at Google.  For example, on or about October 15, 2025, and November 27, 2025, Spagnuolo accessed confidential information regarding the anticipated 2025 Year in Search List via an internal software tool at Google.

33.    As a result of his employment with Google, and prior to any trading he did on Polymarket.com in the relevant contracts, Spagnuolo acquired and was privy to nonpublic information about the anticipated rankings in the 2025 Year in Search List ("Confidential Information").

34.    Spagnuolo acquired the Confidential Information by virtue of his employment with Google.  At the time that he acquired the Confidential Information, Spagnuolo knew that it was not generally available to the public.

35.    The Confidential Information was information that would affect or tend to affect the price of a swap, namely event contracts related to the rankings reflected in the 2025 Year in Search List, and thus material as to those contracts.

### E.    Duty of Trust and Confidentiality

36.    Spagnuolo owed a duty of trust and confidentiality to Google to maintain the confidentiality of the Confidential Information.

37.    Google's corporate policies mandate that its employees maintain the confidentiality of proprietary non-public company information.    Prior to the Relevant Period, Spagnuolo completed training on those policies.    Further, by virtue of his employment, Spagnuolo had access to certain internal Google tools to obtain access to nonpublic 2025 Year in Search List data, which bear a "Google Confidential" label.

### F.    Defendant's Trading in 2025 Year in Search List

38.    Spagnuolo opened an account on Polymarket using the handle "AlphaRaccoon" in May 2024.

39.    The Alpharaccoon Polymarket account was funded by a particular cryptocurrency wallet ("Wallet-0xAf6") in or about October and November 2025.

40.    Through a series of transactions in November 2025, Wallet-0xAf6 sent cryptocurrency to a particular cryptocurrency swapping service and then to a particular cryptocurrency payment processor, which were received by an account in Spagnuolo's name which was opened using Spagnuolo's Italian Government identification card.

41.    Notwithstanding his duties of trust and confidentiality, Spagnuolo illicitly used the Confidential Information to trade event contracts related to the release of the 2025 Year in Search List.

42.    Between approximately October 15, 2025, and December 4, 2025, Spagnuolo purchased "Yes" or "No" shares on at least twenty-three of the 2025 Year in Search List contracts, with near-perfect accuracy.

43.    At the time Spagnuolo purchased these shares, the rankings reflected in the 2025 Year in Search List had not been publicly announced, and Google had not disclosed the Confidential Information concerning the 2025 Year in Search List to the trading public or general public.

44.    The 2025 Year in Search List was ultimately released by Google on December 4, 2025.  The contracts traded by Spagnuolo include those in the chart below.  Spagnuolo correctly predicted virtually all of the outcomes on these positions.

| Market |
| --- |
| Will Pope Leo XIV be the #1 searched person |
| Will d4vd be the #1 searched person |
| Will Bianca Censori be the #1 searched person |
| Will Donald Trump rank in the Top 5 most searched |
| Will Zohran Mamdani rank in the Top 5 most searched |
| Will Donald Trump be the #1 searched person |
| Will Kendrick Lamar rank in the Top 5 most searched |
| Will Kendrick Lamar be the #1 most searched |
| Will Bianca Censori rank in the Top 5 most searched |
| Will Jimmy Kimmel rank in the Top 5 most searched |
| Will Pope Leo XIV rank in the Top 5 most searched |
| Will d4vd rank in the Top 5 most searched |
| Will Sydney Sweeney be the #1 searched actor |
| Will Tyler Robinson rank in the Top 5 most searched |
| Will Sydney Sweeney be the #1 searched actor |
| Will Charlie Kirk be #1 searched passing |
| Will Luigi Mangione rank in Top 5 most searched |
| Will Elon Musk rank in the Top 5 most searched |
| Will Zohran Mamdani be the #2 searched person |
| Will Taylor Swift rank in the Top 5 most searched |
| Will Zohran Mamdani be the #1 searched person |
| Will Squid Game be the #1 searched TV show |
| Will Andy Byron rank in the Top 5 most searched |

45.    In or about December 2025, when the 2025 Year in Search List Contracts resolved, the AlphaRaccoon Polymarket account received approximately 3,914,362 million USDC.e.

46.    In or about December 2025, the AlphaRaccoon Polymarket account sent approximately 5.045 million USDC.e to Wallet-0xAf6.

47.    Spagnuolo used the Confidential Information in his personal capacity and for his personal gain when buying shares in the 2025 Year in Search List Contracts.  By doing so, Spagnuolo breached his duty to maintain the confidentiality of, and not use, the Confidential Information, and by breaching that duty, Spagnuolo stole, converted, or misappropriated the Confidential Information.

48.    In or about December 2025, after online news reports that raised suspicion about the trading on Polymarket by user "AlphaRaccoon," Spagnuolo changed his Polymarket handle.

## VII.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### COUNT ONE

### Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1), (3), 17 C.F.R. § 180.1(a)(1), (3) (2025)

49.    The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

50.    The 2025 Year in Search List Contracts are swaps as defined by Section 1a(47) of the Act, 7 U.S.C. § 1a(47).

51.    Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), makes it unlawful for any person, directly or indirectly, to:

> [U]se or employ, or attempt to use or employ, in connection with any swap . . . any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after [July 21, 2010, the date of enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act].

52.     Regulation 180.1(a)(1), (3), 17 C.F.R. § 180.1(a)(1), (3) (2025), provides, in part:

It shall be unlawful for any person, directly or indirectly, in connection with any swap . . . to intentionally or recklessly: (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; . . . [or] (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

53.     During the Relevant Period, Spagnuolo acquired Confidential Information regarding the rankings reflected in the 2025 Year in Search List that was material to the price of the 2025 Year in Search List Contracts.

54.     Any reasonable market participant would have viewed the Confidential Information as important in deciding whether to purchase "Yes" or "No" shares in the 2025 Year in Search List Contracts.

55.     As an employee of Google with access to nonpublic information, including with respect to the 2025 Year in Search List, Spagnuolo owed a duty of trust and confidentiality to Google.

56.     Spagnuolo misappropriated the material Confidential Information by knowingly or recklessly using it to trade the 2025 Year in Search List Contracts in breach of his duties of trust and confidentiality.

57.     Spagnuolo engaged in this scheme for the sole purpose of obtaining profits for his own personal gain.  As set forth above, as a direct result of his trading in the 2025 Year in Search List Contracts using material Confidential Information, Spagnuolo obtained approximately 1.2 million dollars in profits.

58.     Each fraudulent or deceptive act, including each trade Spagnuolo placed in the 2025 Year in Search List Contracts using misappropriated material Confidential Information, is alleged as a separate and distinct violation of Section 6(c)(1) of the Act and Regulation 180.1(a)(1), (3).

59.     Spagnuolo engaged in the acts and practices described above willfully, knowingly or with reckless disregard.

## VIII.   RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

A.  Enter an order finding that Spagnuolo violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1), (3), 17 C.F.R. § 180.1(a)(1), (3) (2025);

B.  Enter an order of permanent injunction enjoining Spagnuolo, and his affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with him, who receive actual notice of such order by personal service or otherwise, from engaging, directly or indirectly, in conduct in violation of Section 6(c)(1) of the Act and Regulation 180.1(a)(1), (3);

C.  Enter an order of permanent injunction enjoining Spagnuolo, and his affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with him, from directly or indirectly:

   1)  Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

   2)  Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2025)), for accounts held in the name of Spagnuolo or for any account in which Spagnuolo has a direct or indirect interest;

   3)  Having any commodity interests traded on Spagnuolo's behalf;

14

4) Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5) Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

6) Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2025); and

7) Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2025)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the CFTC except as provided for in Regulation 4.14(a)(9);

D. Enter an order requiring Spagnuolo, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act and Regulations as described herein, including pre-judgment and post-judgment interest;

E. Enter an order requiring Spagnuolo, as well as his successors, to make full restitution, pursuant to such procedure as the Court may order, to every person who has sustained losses proximately caused by the violations described herein, including pre-judgment interest and post-judgment interest;

F.  Enter an order directing Spagnuolo to pay a civil monetary penalty, to be assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, 129 Stat. 584 (2015), title VII, Section 701, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2025), for each violation of the Act and Regulations, as described herein, plus post-judgment interest;

G.  Enter an order requiring Spagnuolo to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2); and

H.  Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

## IX.    DEMAND FOR JURY TRIAL

Plaintiff CFTC hereby demands a jury trial.

Dated:  May 27, 2026                    **COMMODITY FUTURES TRADING COMMISSION**

/s/Jacob Mermelstein

Jacob Mermelstein, Trial Attorney
Alyson Cohen, Trial Attorney
Benjamin J. Rankin, Trial Attorney
Patryk J. Chudy, Associate Director
COMMODITY FUTURES TRADING COMMISSION
Ted Weiss Federal Office Building
290 Broadway, Suite 600
New York, NY 10007
Phone: (646) 746-9700
jmermelstein@cftc.gov
acohen@cftc.gov
brankin@cftc.gov
pchudy@cftc.gov

John Dunfee, Assistant Chief, Complex
Fraud Task Force (*pro hac vice forthcoming*)
Paul G. Hayeck, Deputy Director
(*pro hac vice forthcoming*)
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st St. NW
Washington, DC 20581
Phone: (202) 418-5000
jdunfee@cftc.gov
phayeck@cftc.gov

ATTORNEYS FOR PLAINTIFF
COMMODITY FUTURES TRADING
COMMISSION